UNITED STATES of America, Appellee,

v.

Olurotimi Olatunde LAYENI, Appellant.

No. 95–3032.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 16, 1996.

Decided July 30, 1996.

Rehearing Denied Sept. 12, 1996.\*

---

\* Circuit Judge Rogers would grant the petition for rehearing.

Roberto Iraola, Washington, DC, argued the cause for appellant. Benjamin B. Klubes and Barry Coburn were on brief.

Magdalena A. Bell, Assistant United States Attorney, argued the cause for the appellee. Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas C. Black and Eileen C. Mayer, Assistant United States Attorneys, were on brief.

Before: BUCKLEY, HENDERSON and ROGERS, Circuit Judges.

KAREN LECRAFT HENDERSON, Circuit Judge:

The Federal Bureau of Investigation (FBI) initiated Operation Wild Horse to target heroin importation and distribution in the Washington area. Appellant Olurotimi Olatunde Layeni was caught during the investigation. A jury convicted him of conspiracy to distribute and to possess with intent to distribute heroin as well as multiple counts of heroin distribution. He challenges his conviction on two grounds. First, he contends there was evidence from which a reasonable juror could find he had been induced by a government informant, albeit indirectly, to participate in the criminal activity and therefore the district court should have instructed the jury on the defense of entrapment. Second, he argues that the admission of the government's expert testimony denied him a fair trial. He also challenges his sentence, arguing that in several respects the district court erred in calculating his offense level under the United States Sentencing Guidelines (Guidelines). For the following reasons we affirm.

## I

Layeni traces his misfortunes to his friendship with Arlene White. White, a drug broker, was the girlfriend of Layeni's cousin Francis, a heroin supplier to street gangs in the District of Columbia. In June 1991 Layeni, at White's request, obtained heroin from one of Francis's associates and, posing as Francis, helped White sell the heroin to a man they knew as "Ralph Martin." Unbeknownst to both White and Layeni, he was an undercover FBI agent. According to Layeni, the June 1991 deal was his first step into the world of illegal drugs. It was not to be his last. During the next two and one-half years Layeni conspired with others in the heroin trade and distributed large quantities of heroin to Ralph. In December 1993 the FBI arrested Layeni. An eleven-count superseding indictment charged him with conspiring to distribute, and to possess with intent to distribute, heroin as well as with ten counts of heroin distribution. At trial Layeni did not dispute that he committed all the acts charged in the indictment; indeed the transactions were recorded on audio and video tape. His sole defense was entrapment. He claimed he had been entrapped in connection with the initial (June 1991) transaction and that his criminal activities throughout the next two and one-half years were the product of the initial entrapment. The district court declined to instruct the jury on entrapment and the jury convicted him on all counts. The court sentenced him to 210 months of imprisonment on each count, to run concurrently.

## II

A. *Entrapment.*

Layeni argues first that the district court erred in declining his request for an entrapment instruction. The entrapment defense has two elements: government inducement to commit a crime and lack of predisposition on the part of the defendant to commit the crime. "[1] [O]nce a defendant meets his burden of proving that the government persuaded him to commit a crime, [2] the government must prove beyond a reasonable doubt that the defendant was ready and willing to do so." *United States v. McKinley,* 70

F.3d 1307, 1312 (D.C.Cir.1995) (quoting *United States v. Whoie*, 925 F.2d 1481, 1485 (D.C.Cir.1991)). Here, the district court declined to instruct the jury on entrapment because the record contained "not . . . even a scintilla of evidence of an inducement by a governmental official." 10/26/94 Tr. at 47. *See Lopez v. United States*, 373 U.S. 427, 434–35, 83 S.Ct. 1381, 1385–86, 10 L.Ed.2d 462 (1963) ("[B]efore the issue of entrapment can fairly be said to have been presented in a criminal prosecution there must have been at least some showing of the kind of conduct by government agents which may well have induced the accused to commit the crime charged."). The issue before us is whether there is any evidence in the trial record from which a reasonable juror could find that the government induced Layeni to participate in the June 1991 transaction.[1] Our review is *de novo*. *United States v. Ortiz*, 804 F.2d 1161, 1164 (10th Cir.1986).

We view the evidence relating to the June 1991 deal in the light most favorable to Layeni as follows: As early as February 1990 Ellis Watson, a federal prisoner and an uncle of Arlene White's brother-in-law, became an unpaid FBI informant. In this capacity he was in regular contact with FBI agent Wanda King, the supervisor of Operation Wild Horse. Watson set up a sting to nab Francis who, to repeat, was White's boyfriend and Layeni's cousin. To that end, Watson called White from prison in June 1991 and asked her to introduce his friend "Ralph" to Francis. White agreed, understanding that Ralph wanted to buy heroin from Francis, but she did not know that Watson had ties to the FBI. Meanwhile, Watson telephoned King, told her about the proposed sting and advised her that the FBI's undercover agent should use the name "Ralph." King assigned FBI Agent Edward Dickson to the case. He contacted White and introduced himself as Ralph Martin. White arranged for him to buy heroin from Francis on June 19. Francis, however, was out of town that day.

White decided to take over the deal herself and have Layeni pose as Francis.

Accordingly, on the morning of June 19 White contacted Layeni. After describing the proposed transaction with Ralph, White asked Layeni to obtain the heroin from one of Francis's associates ("Tunji") and to help her consummate the deal. According to Layeni, he at first declined her request but eventually "relented" because White asserted that she needed money to pay bills. After agreeing to assist White, Layeni persuaded Tunji to supply the heroin and, after White introduced Layeni to Ralph as "Francis," the two (White and Layeni) sold an ounce of heroin to Ralph. White split the profit with Layeni.

Layeni contends that White induced him to participate in the June 19 deal by making repeated requests coupled with pleas based on need, sympathy and friendship. White, however, was a private citizen, not an agent knowingly acting on behalf of the government, and there is no defense of private entrapment. *United States v. Burkley*, 591 F.2d 903, 911 n. 15 (D.C.Cir.1978), *cert. denied*, 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979). Nevertheless, Layeni asserts that because Watson, a government informant and hence government agent, solicited White, White's alleged inducement of Layeni can be imputed to Watson and thus to the government. We disagree. Even assuming a jury could find both that Watson acted as a government agent when he solicited White's assistance and that White induced Layeni, Layeni's entrapment theory fails because he cannot satisfy the government inducement element of the entrapment defense.

We begin by noting that "entrapment is a relatively limited defense" grounded on "the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense, but was induced to commit them by the Government." *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973). Some

---

1. Layeni appears to assume that if he prevails on this issue he is entitled not only to an entrapment instruction covering the June 1991 transaction (count two of the indictment) but also to the "continuing entrapment" instruction he requested to encompass his subsequent criminal activity. We recently rejected the continuing entrapment theory he relied on below. *United States v. Vaughn*, 80 F.3d 549 (D.C.Cir.1996).

courts have held that there is no basis for the entrapment defense if the defendant is not induced *directly* by a government official or an agent deliberately acting on behalf of the government. *See, e.g., United States v. Martinez*, 979 F.2d 1424, 1432 (10th Cir.1992), *cert. denied*, 507 U.S. 1022, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993); *United States v. Emmert*, 829 F.2d 805, 808–09 (9th Cir.1987); *United States v. Beverly*, 723 F.2d 11, 12 (3d Cir.1983) (per curiam). Other courts, however, "have also recognized that, under certain circumstances, an unknowing middleman ... can satisfy the element of governmental inducement in another's entrapment defense." *United States v. Hodges*, 936 F.2d 371, 372 (8th Cir.1991). That is, "the government may entrap a defendant through the actions of an 'ignorant pawn.'" *United States v. Jones*, 839 F.2d 1041, 1054 (5th Cir.), *cert. denied*, 486 U.S. 1024, 108 S.Ct. 1999, 100 L.Ed.2d 230 (1988).

Our circuit has not been clear whether or under what circumstances a defendant may claim he was entrapped by an "unknowing intermediary." In *United States v. Mayo*, 498 F.2d 713 (D.C.Cir.1974), after declaring that the entrapment defense is available if "a Government official uses a private citizen as an agent, and in such manner induces" the defendant, *id.* at 716, we indicated that the private intermediary must be "purposefully acting on behalf of the Government," *id.* at

717 (dictum). However, a decade earlier, in *Johnson v. United States*, 317 F.2d 127 (D.C.Cir.1963), a decision relied on by *Mayo*, we stated that an entrapment defense may apply if an "officer acts through a private citizen" to induce the defendant, *id.* at 128, and we suggested that the intermediary need not knowingly act on behalf of the government (the intermediary there was indicted along with the defendant).[2]

In any event, assuming that under some circumstances a defendant may be entrapped by an unknowing intermediary, there is no basis to impute to the government White's decisions to solicit Layeni and, allegedly, to induce him to assist her on June 19. There is no evidence that informer Watson used or acted through White to induce Layeni. The alleged inducement here—White's plea based on need, sympathy and friendship—did not flow from Watson. More to the point, Watson solicited White to nab Francis, not Layeni; White deviated from Watson's scheme when she allegedly induced Layeni. Indeed, even if White had induced *Francis*, the intended target of the government's sting, Francis would not be entitled to an entrapment instruction because there is no evidence that Watson suggested that White should "use inducements" to bring him to the table. *United States v. Goodacre*, 793 F.2d 1124, 1125 (9th Cir.), *cert. denied*, 479 U.S. 993, 107 S.Ct. 595, 93 L.Ed.2d 595 (1986); *see United*

---

**2.** Layeni reads far too much into *Johnson*. There an undercover police officer supplied a man named Turner with money to purchase narcotics and drove him to a restaurant. Turner went into the restaurant and returned with the defendant. At the defendant's direction, the officer drove to a location where the defendant purchased heroin capsules with the officer's money. The defendant told Turner in the presence of the officer that he was keeping one capsule for his effort and handed the remaining capsules to Turner who gave them to the officer. We held that the defendant was entitled to an entrapment instruction because a jury could reasonably find that "the officer act[ed] through" Turner to induce the defendant. *Id.* at 128. Specifically, a jury could find that the defendant was induced by the "hope of reward" and that the officer was the source of the inducement, *id.* at 128–29 & n. 1, for only he, as owner of the capsules, could have authorized the reward. The jury could reasonably infer that Turner acted at the direction of the officer who used him to induce the defendant.

*Johnson* held that the prospect of a reward *per se* could constitute inducement and thus the defendant who followed a criminal path with the "hope of reward" was entitled to an entrapment instruction. But we have since rejected "the proposition that an offer of reward standing alone entitles the defendant to an entrapment instruction." *McKinley*, 70 F.3d at 1313 n. 3. *A fortiori* the government's failure to disabuse a defendant of his mere "hope of reward" does not warrant an entrapment instruction. Indeed, the reward hoped for and received by Johnson (drugs and perhaps money) is "the typical benefit of participating in this type of criminal enterprise, a form of reward that is not sufficient, by itself, to establish inducement." *Id.* at 1314. And as we have made clear since *Johnson*, "'mere solicitation' by the Government ... does not evince inducement." *Id.* at 1312 (quoting *United States v. Borum*, 584 F.2d 424, 428 (D.C.Cir.1978)) (emphasis in *McKinley*).

States v. Hernandez, 995 F.2d 307, 313 (1st Cir.) (entrapment defense not available "to a defendant in contact *only with an intermediary*, and not the government agent, absent a showing that pressure had been put upon him by the intermediary *at the instruction of the government agent*") (internal quotation marks omitted, emphasis in original), *cert. denied*, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993).

Both below and on appeal Layeni has relied on *United States v. Hollingsworth*, 27 F.3d 1196 (7th Cir.1994) (en banc). There defendants Pickard and Hollingsworth were in the international banking business. The Seventh Circuit concluded that a U.S. customs official entrapped Pickard by inducing him to participate in an international money laundering scheme (wiring money to foreign bank account). The customs official did not suggest that Pickard involve anyone else in the scheme; nonetheless Pickard on his own pulled Hollingsworth in as a participant. The court, uncomfortable with the prospect of affirming Hollingsworth's conviction after having reversed Pickard's conviction, concluded that the customs official "induce[d] ... the association of Hollingsworth with Pickard in the scheme that [the official] had hatched" which was enough to make Pickard the custom official's "agent" when Pickard "entrapped" Hollingsworth. *Id.* at 1204. The court held:

> Perhaps the most accurate statement of the current law is that while there is no defense of either private entrapment or vicarious entrapment, there is a defense of derivative entrapment: when a private individual, himself entrapped, acts as agent or conduit for governmental efforts at entrapment, the government as principal is bound.

*Id.* But see *id.* at 1218–19 (Ripple, J., dissenting).

We fail to see how *Hollingsworth* helps Layeni. First, there is no evidence that Watson entrapped White when he asked her to arrange the introduction of Ralph to Francis. In addition to White's own predisposition (she was a drug broker whose business was to put buyers and sellers together), the record plainly shows that Watson did not induce White. *Cf. supra* note 2 (mere solicitation is not inducement). Second, even if there were evidence that Watson entrapped White to introduce Ralph to Francis, Layeni could not benefit from Watson's entrapment of White because she abandoned Watson's scheme when she substituted Layeni for Francis. *Hollingsworth*, 27 F.3d at 1204 ("We add that if the first person whom the government entraps expands, embroiders, or elaborates the scheme proposed to him by the government, the accomplices with whom he associates himself in the larger scheme cannot shelter under his entrapment defense ...."); *see United States v. Pilarinos*, 864 F.2d 253, 256 (2d Cir.1988) ("[W]here a government agent induces a middleman to commit a crime, and the middleman, responding to the pressure upon him, takes it upon himself to induce another person to participate in the crime, the latter person is not entitled to a derivative entrapment charge.") (internal quotation marks and citation omitted).

In rejecting Layeni's argument we do not *sub silentio* endorse the derivative entrapment defense applied in *Hollingsworth*. The accuracy of the Seventh Circuit's "statement of the current law" is disputed, *cf. Martinez*, 979 F.2d at 1432 (commenting that "the majority of Circuits ... have not recognized the defense of vicarious or derivative entrapment" and citing cases), and the court's analysis, with respect, is less than compelling. First, the decision strikes us as unfaithful to the Supreme Court's admonition that entrapment is a narrow defense. *See Russell*, *supra*. Second, the decision does not adequately explain the differing treatment of defendant X—entrapped by a codefendant entrapped by the government—and defendant Y—entrapped by a predisposed codefendant solicited by the government: Y goes to jail while X goes free, their different destinations having nothing to do with either *their* willingness or the government's conduct. Third, the court's approach could unnecessarily complicate many criminal trials. *See generally United States v. Bradley*, 820 F.2d 3, 7–8 (1st Cir.1987). "When the issue is whether an entrapped intermediary entrapped the defendant, the government is a

stranger to the entire transaction" and therefore likely will have difficulty countering the defendant's entrapment claim. *Id.* at 7. Moreover, the defendant's trial could be sidetracked by a sub-trial concentrating on the intermediary's predisposition.

■ We think the better rule is that the entrapment defense can be raised by a defendant who was induced by an unknowing intermediary at the instruction or direction of a government official or third party acting on behalf of the government (*e.g.*, an informant). The defense should not apply if, in response to pressure put on him by the government, the unknowing intermediary *on his own* induces the defendant to engage in criminal activity.

### B. *Admission of Expert Testimony.*

■ Layeni's next assignment of error relates to the testimony of Agent Dwight A. Rawls, the government's expert witness. The only argument that warrants discussion involves Rawls's testimony about Nigeria and Nigerians. Layeni asserts it was inadmissible under rule 402 (irrelevant evidence inadmissible) or rule 403 (relevant evidence excludable if danger of unfair prejudice substantially outweighs probative value) of the Federal Rules of Evidence.

First some background. Wanda King testified that Operation Wild Horse "specifically targeted Nigerian Nationals" because the FBI had learned from informants that heroin was coming into the Washington area from Nigeria. 10/4/94 Tr. at 89. In addition, Agent Dickson (Ralph) testified that the first time he met with Layeni after the June 1991 transaction he "gained a ton of intelligence and information about heroin trafficking from Lagos, Nigeria, to Washington, D.C., the cost of heroin ... in Lagos and the ultimate cost of that heroin here in Washington, how the heroin is smuggled and carried here to the United States, how money is smuggled out of this country into Lagos." 10/7/94 Tr. at 15. Layeni telephoned his brother Olu, who was in London, and Ralph and Olu discussed Ralph's establishing a direct heroin connection in Lagos. Olu and Ralph later devised a scheme whereby Olu would transport a kilogram of heroin from Lagos to London where Ralph would be waiting to smuggle it into the United States. When Ralph delayed his trip to London, Layeni himself traveled to Nigeria and returned to Washington with 500 grams of heroin which he tried, unsuccessfully, to sell to Ralph. The Lagos–London–Washington scheme fell through when Olu died suddenly in the fall of 1993.

The government called Agent Rawls as an expert in the field of drug trafficking, "particularly heroin including its importation, production, distribution and the financial aspects involved." 10/19/94 Tr. at 37. Rawls testified about, among other things, the heroin market in Nigeria, Nigeria's role as a "transshipment point" along trade routes in the international heroin market, Nigeria's role as a major source of heroin destined for the United States and how Nigerians smuggle heroin into the United States. Layeni repeatedly objected "to the line of questioning focusing on Nigeria and Nigerians." *Id.* at 44. The court overruled his objections.

Relying on *United States v. Doe,* 903 F.2d 16 (D.C.Cir.1990), Layeni argues that he was denied a fair trial as a result of Rawls's testimony. *Doe* involved Jamaican defendants charged with possessing with intent to distribute drugs found in an apartment that served as a base for drug activity. The government called (the same) Agent Rawls as an expert on the preparation and distribution of crack and cocaine. He went well beyond the topics, however, and we found error. First, he testified that Jamaicans had taken over the local drug market. We held that under rule 402 the testimony was inadmissible because it had no bearing on whether the defendants committed the offense charged in the indictment (possession with intent to distribute the drugs found in the apartment) or on any other issue at trial. *Id.* at 20–21. We noted, moreover, that the testimony "was openly allusive in linking the drug charges to [the defendants] solely on the basis of [their] ancestry." *Id.* at 20. Second, Rawls testified that Jamaicans were commandeering local apartments and using them as preparation and distribution centers. Although the testimony was "arguably" relevant (the government's trial theory was that

the defendants had done likewise), *id.* at 21, we held the testimony inadmissible under rule 403 because its likely prejudicial impact outweighed its probative value, *id.* at 21–22.

The government here asserts that, contrary to *Doe*, "[t]he scope of Operation Wild Horse, as well as the evidence of appellant's involvement in the Nigerian heroin trade, made the expert's testimony both relevant and necessary." Brief of Appellee at 28. But the scope of Operation Wild Horse was at most background information and Layeni was not on trial based on his involvement in the Nigerian heroin trade; he was charged with conspiracy to distribute (and to possess with intent to distribute) heroin in the United States and ten specific acts of distribution in the United States. We have difficulty with the government's assertion that "Nigeria, and appellant's link to it, was *directly* relevant to appellant's participation in the conspiracy to possess and distribute heroin in the United States." *Id.* at 31 (emphasis added). But even if the court erred in allowing Rawls's testimony, we fail to see how the error could have been anything but harmless. *See* Fed.R.Crim.P. 52(a). Layeni "never disputed that he engaged in the transactions alleged in the indictment" and his "only defense was entrapment." Brief of Appellant at 7 n.6. Because we hold that the court correctly declined to instruct the jury on entrapment, there is no reasonable likelihood that the admission of Rawls's testimony could have affected the outcome of the trial. *See United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993).

### III

A. *Relevant Conduct: Drug Quantities.*

Layeni's presentence investigation report (PSI) attributed 4,522 grams of heroin to him as "relevant conduct" and fixed his base offense level at 34. *See* USSG § 2D1.1(c)(3) (base offense level 34 for offense involving at least 3,000 but less than 10,000 grams of heroin). The PSI total included 1,321 grams that Layeni in fact distributed to Ralph and

another 3,201 grams that were neither distributed to Ralph nor seized by the authorities. The latter figure consists of (1) amounts that Layeni offered to Ralph but Ralph did not purchase and (2) amounts that Ralph agreed to purchase and Layeni promised to produce but did not. In a memorandum filed with the court, Layeni objected to the PSI tally. Citing former application note 12 to Guidelines section 2D1.1 (1994),[3] he argued that his sentence should reflect only the amounts he in fact distributed to Ralph. Former note 12 provided:

> In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

Relying on *United States v. Raven,* 39 F.3d 428 (3d Cir.1994), Layeni argued that former note 12 should be applied in three steps: first, the government has to establish the amount of drugs negotiated; second, once the government establishes the amount negotiated, the burden shifts to the defendant to "come forward with evidence supporting the proposition that he or she lacked *both* the intent *and* the reasonable capability to produce the drugs in question"; third, if the defendant satisfies his burden of production, "the government then must prove *either* that the defendant intended to produce the negotiated amount of drugs *or* that he or she was reasonably capable of doing so." *Id.* at 434–35 (emphasis in original). Layeni argued that his objection to the PSI satisfied his burden of production and he asked the court to make specific findings on whether he had the intent and the capability to produce the negotiated amounts that were never distributed; he did not argue that the PSI included

---

3. The court used the 1994 version of the Guidelines in sentencing Layeni. Effective November 1, 1995, the Sentencing Commission deleted the text of note 12 to section 2D1.1 and replaced it with a new note 12. We refer to the 1994 version as former note 12.

amounts that were not "under negotiation" (step one of the *Raven* framework).

At sentencing, Layeni was questioned about each disputed amount listed in the PSI. In each instance Layeni testified that he lacked both the intent and the capability to produce the heroin and that he was only "puffing" when he made the offer or promise. (For example, Layeni allegedly had neither the intent nor the capability to produce the 100 grams of heroin he offered to Ralph on February 12, 1992—notwithstanding that three weeks earlier (January 21) he sold 299 grams to Ralph and two weeks later (February 26) he sold 200 grams to Ralph.) The government argued that Layeni's sentencing testimony did not undercut the trial evidence (including audio and video recordings of Layeni's discussions with Ralph) indicating that Layeni had both the intent and the capability to produce the challenged amounts. The court agreed and expressed its frustration with Layeni's insistence that he was "puffing" each time he offered or promised to sell amounts that ultimately were not distributed:

> I don't believe one word that Mr. Layeni testified to today. He simply cannot be believed. He is just dishonest. It was just evident. His manner of testifying, the way he answered questions, his demeanor, everything just made it clear to me that he just is dishonest.... My goodness, does he honestly and truly believe that someone would believe what he has testified to in here today? It was just evident, I think, to everybody in this courtroom that not one word he uttered was truthful. So, I don't believe him. I don't believe his testimony.

3/2/95 Sentencing Tr. at 85

Layeni raises a new argument on appeal. Whereas his sole argument below was that he had neither the intent nor the capability to produce the amounts that were never distributed, he now argues that the court should have ignored most of the disputed amounts because they were mere *offers* to sell or obtain heroin, offers Ralph did not accept and in some cases declined. An amount "un-der negotiation" (see former note 12) means an "agreed to" amount, he now contends, and if Ralph did not unequivocally accept an offer, there was no agreement. In other words, he now argues that the government failed to satisfy step one of *Raven*. *See supra.*

■ Arguments not raised in the district court are generally deemed waived on appeal absent plain error. *United States v. Broxton,* 926 F.2d 1180, 1183 (D.C.Cir.) (per curiam), *cert. denied,* 499 U.S. 911, 111 S.Ct. 1118, 113 L.Ed.2d 226 (1991); *United States v. Ortez,* 902 F.2d 61, 64 (D.C.Cir.1990). The government, however, has waived the waiver argument by not raising it. *See Hollingsworth,* 27 F.3d at 1203. Nevertheless, there was no error here, plain or otherwise. "[T]he text of the Application Note—'under negotiation'—plainly requires only discussion, not an agreement or a completed transaction." *United States v. Williams,* 994 F.2d 1287, 1294 (8th Cir.1993); *id.* at 1293–94 ("Once the agent asked about the price of a quarter-pound, Williams did offer to try to obtain and sell him this amount. We think this is clearly sufficient to show that the additional quantity was 'under negotiation' which is all that [former note 12] requires. It does not require a completed sale or an agreement to sell."). With the exception of one incident listed in the PSI, all of the offers were accompanied by discussion and hence negotiation.[4] Moreover, in light of the extensive course of dealing between the parties it is of no moment that precise terms, like those relating to payment or delivery, were not always fixed during the negotiations. The key is that Layeni was apparently willing and able to produce the quantities and therefore the court was justified in including them as relevant conduct.

The weakness in Layeni's argument surfaces in the following hypothetical. An undercover agent expresses interest in purchasing heroin and, after some discussion, the defendant responds by offering to sell him 100 grams, an amount the defendant plainly intends to produce and is in fact capable of

---

**4.** The one incident involved 400 grams offered on September 30, 1992. Inclusion of the 400 grams does not affect Layeni's base offense level; he is well above the 3,000–gram floor for base offense level 34 irrespective of the 400 grams. *See supra.*

producing. According to Layeni, the 100 grams may not be considered at sentencing unless the record manifests that the agent accepted the offer. But the defendant's conduct and culpability are the same irrespective of the agent's response. The "scale of the offense" turns on whether the defendant had the intent or the capability to produce the drugs he offered (capability to produce bears on the issue of intent) not on whether the agent had the intent or capability to consummate the sale. USSG § 2D1.1, application note 12 (1994). The hypothetical would be different, of course, if the *agent* offered to buy 100 grams from (or sell 100 grams to) the *defendant.* Then it makes sense to determine what the defendant agreed to sell (or purchase) in order to ascertain his intent and thus properly quantify the contraband. *United States v. Ynfante,* 78 F.3d 677, 681 (D.C.Cir.1996) (noting that "[w]hatever the police may offer, the key is what the defendant agrees to").

\* \* \*

In a separate argument, Layeni challenges the court's inclusion of 1,001 grams in connection with two uncompleted distributions. First, Layeni and a coconspirator agreed on January 15, 1992 to deliver 1,000 grams to Ralph in Chicago but produced only 299 grams initially because their Chicago supplier insisted on releasing the heroin in small amounts; Ralph, apparently impatient, left Chicago before Layeni delivered the remaining 701 grams. Second, on May 8, 1992 Layeni sold 200 grams to Ralph and promised to return that morning with 300 more but was unable to do so because his supplier unexpectedly left town. Layeni challenges the court's finding that he was capable of producing the additional 701 and 300 grams, respectively. His challenge fails.

First, in light of our conclusion above upholding the court's inclusion of the amounts that Layeni offered to Ralph but Ralph never agreed to purchase, Layeni's relevant conduct total would still exceed 3,000 grams (and thus his base offense level would remain 34) even if the disputed 1,001 grams were erased from the record. Second, even if the district court had erred in finding that Layeni was *capable* of producing the additional 1,001 grams, Layeni does not appear to dispute the court's finding (a finding well supported by the record) that he had the *intent* to produce the additional 1,001 grams. Under former note 12 the government need not show that Layeni had *both* the intent *and* the capability to produce the disputed amounts; the government need show only that he had *either* the intent *or* the capability to produce them. *Raven,* 39 F.3d at 434 (citing cases).[5] Third, and in any event, we detect no clear error in the court's finding that Layeni was capable of producing the additional amounts. *Cf. United States v. Lindia,* 82 F.3d 1154, 1160 (1st Cir.1996) (although defendant previously delivered marijuana only in 30– and 40–pound lots, "court was free to reject, as it did, [defendant's] claim that the discussion of the 150 pounds was mere 'puffing' to impress the buyer into future negotiations").

### B. *Acceptance of Responsibility.*

Layeni next argues that the district court erred in failing to award him a two-level reduction in his offense level for acceptance of responsibility. The Guidelines provide a two-level reduction "[i]f the defendant *clearly demonstrates* acceptance of responsibility for his offense." USSG § 3E1.1(a) (emphasis added). The PSI did not recommend the reduction on the ground that Layeni "elected not to discuss the instant offense" with the probation office. PSI at 9. Layeni filed an objection to the PSI, arguing that "[t]he defendant's willingness to discuss the offense with the presentence report writer ... is completely irrelevant to his eligibility for a reduction for acceptance of responsibility." Defendant's Memorandum in Aid of Sentencing (Sentencing Mem.) at 7. *But see United States v. Corral–Ibarra,* 25 F.3d 430, 440 (7th Cir.1994) (refusal to discuss circum-

---

5. We note that, unlike former note 12, the current version of note 12 provides that the court must exclude an amount if the court finds that the defendant was not capable of producing the amount or did not intend to produce the amount. USSG § 2D1.1, application note 12 (1995) ("[T]he court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing.").

stances of offense with probation office constitutes failure to cooperate with sentencing court's efforts to gather information and is inconsistent with acceptance of responsibility); *cf. United States v. Reid,* 997 F.2d 1576, 1580 (D.C.Cir.1993) (relying in part on defendant's "failure to discuss the case with his probation officer"), *cert. denied,* 510 U.S. 1132, 114 S.Ct. 1105, 127 L.Ed.2d 417 (1994). He argued further that "he should be accorded" the two-level reduction because he "never disputed his complicity in the charged drug transactions" but instead claimed entrapment. Sentencing Mem. at 8. The district court disagreed and so do we.

■■■■ The sentencing court "normally should deny the two-point reduction to a defendant who does not plead guilty." *United States v. Jones,* 997 F.2d 1475, 1478 (D.C.Cir.1993) (en banc), *cert. denied,* 510 U.S. 1065, 114 S.Ct. 741, 126 L.Ed.2d 704 (1994). In *United States v. Fleener,* 900 F.2d 914, 917–18 (6th Cir.1990), Layeni's principal authority, the Sixth Circuit affirmed the sentencing court's grant of an acceptance of responsibility reduction to a defendant who did not plead guilty but instead went to trial and argued entrapment. However, *"Fleener* does not stand for the proposition that all defendants who go to trial and assert entrapment are entitled to receive the reduction for acceptance of responsibility. Rather, *Fleener* holds that such a reduction is not *per se* unavailable; the court may award the reduction if it finds the facts warrant it." *United States v. Hernandez,* 31 F.3d 354, 361 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 285, 130 L.Ed.2d 200 (1994).

> [I]t remains the defendant's task to manifest in some way that he has in fact acknowledged the wrongfulness of his conduct. The raising of an entrapment defense, in and of itself, does not constitute either an acceptance of responsibility or an expression of remorse for one's criminal conduct. It may indicate that the defendant himself sincerely acknowledges the wrongfulness of his actions, or it may simply represent a tactical choice of counsel. Under § 3E1.1, the responsibility of indicating affirmatively that an assertion of an entrapment

defense reflects the former, not the latter, lies with the defendant.

*Corral–Ibarra,* 25 F.3d at 441 (citation omitted). Here, the court did not conclude that reliance on the entrapment defense automatically bars a defendant from receiving an acceptance of responsibility reduction. Rather, the court properly used Layeni's entrapment argument to find that he had not accepted responsibility. 3/2/95 Sentencing Tr. at 101. *Cf. United States v. Hoenscheidt,* 7 F.3d 1528, 1532 (10th Cir.1993) (no error where sentencing court acknowledged entrapment defense does not necessarily bar section 3E1.1 reduction and "used his entrapment arguments to find [he] had not accepted responsibility"). Moreover, the court concluded that Layeni was not telling the truth when he testified at sentencing that he was "puffing" as to each and every disputed amount included as relevant conduct. *See* USSG § 3E1.1, application note 1(a) ("[A] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."); *see also United States v. Taylor,* 937 F.2d 676, 679–81 (D.C.Cir.1991).

### C. Supervisory Role in the Conspiracy.

Layeni's final argument warrants little discussion. The PSI recommended a two-level enhancement pursuant to section 3B1.1(b) of the Guidelines on the ground that Layeni was a "manager" or "supervisor" in a conspiracy which involved at least five participants. The PSI noted that "[t]he defendant had extensive drug dealings with the undercover officer, made introductions, found resources of heroin for him, conducted negotiations for the supply of heroin to the undercover officer, dealt with other drug dealers and recruited co-conspirators." PSI at 9. Layeni objected, arguing that there was no evidence that he supervised anyone. The court concluded that Layeni was not credible, explained that direct evidence was not necessary to support the adjustment and found that there was "circumstantial evidence galore" that he held a supervisory role. 3/2/95 Sentencing Tr. at 94. We discern nothing even approaching clear error. The finding is supported by the inferences

emanating from the mountain of evidence presented at trial.

For the foregoing reasons the judgment of the district court is

*Affirmed.*