UNITED STATES of America, Appellee,

v.

John C. BRADLEY,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Howard F. GREENBERG,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

John R. BROOKS, Defendant,
Appellant.

Nos. 86–1024, 86–1075 and 86–1076.

United States Court of Appeals,
First Circuit.

Argued Feb. 2, 1987.

Decided May 26, 1987.

Robert A. George, Boston, Mass., with whom Balliro, Mondano & Balliro, was on brief, for defendant, appellant Bradley.

Howard F. Greenberg, submitted on the brief for defendant, appellant Bradley.

Stuart A. Steinberg, Concord, N.H., for defendant, appellant Brooks.

Mitchell D. Dembin, Asst. U.S. Atty., San Diego, Cal., with whom Robert S. Mueller, III, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, ALDRICH and BREYER, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

Defendants, John Bradley, Howard Greenberg, John Brooks, and James Brenner, were indicted and charged in two counts with conspiracy to possess cocaine with intent to distribute, and possession with intent to distribute and aiding and abetting, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 846 and 841(a)(1). Following a joint trial, Bradley and Greenberg were convicted on both counts, Brooks was convicted of the substantive violation only, and Brenner was acquitted altogether, presumably on his special defense of entrapment. The most serious claim is that raised by Bradley to the court's denying him the right to claim entrapment. We conclude that the denial was proper, and affirm the convictions of all defendants.

The nature of Bradley's rejected entrapment defense requires that the facts, including the evidence favorable to defendants, be set forth in some detail. One Michael Constanza was a state prison inmate who offered to name a cocaine seller in return for a recommendation to reduce his sentence. He gave to C.H. Bradley, a local police officer assigned to a regional narcotics force, the name of defendant Brenner. C.H. Bradley made contact with Brenner on July 9 or 10, 1985.

According to C.H. Bradley, Brenner immediately indicated a willingness to sell cocaine, but his initial attempts to arrange a deal fell through. Eventually, a transaction was arranged through defendant John Bradley. In the evening of July 16, the suppliers apparently contacted by John Bradley drove up to the New England Shopping Center in Saugus, Massachusetts, in a stretch limousine. Having arrived in two separate automobiles, Brenner, John Bradley, C.H. Bradley, and Kathleen Bennett, an undercover agent posing as C.H. Bradley's girlfriend, were waiting outside to meet them. Inside the limousine were Greenberg and one Tello;[1] Brooks was the driver. John Bradley and Bennett entered the limo, and Greenberg produced approximately a pound of cocaine and showed it to Bennett. Bennett approved it and, emerging, allegedly to get the money, gave a signal. Government autos approached, and Brooks damaged two of them in an unsuccessful attempt to drive away. The arrests were then made.

On this basis, the government would appear to have proved its case to the hilt against all defendants, with the possible exception of Brooks. However, defendants Brenner and John Bradley countered with claims of entrapment.[2] According to Brenner, his apparent willingness to deal with C.H. Bradley was due to pressure that had been put upon him by Constanza, who had threatened to have him beaten up if he did not obtain a pound of cocaine for a person named "Charlie."[3] Among other things, Constanza told him, "You got no choice in the matter. Either you do this or I am going to have you hurt." He begged Constanza to let him off, but Constanza was obdurate. Thus pressured, he agreed to try to set up the deal, and when "Charlie" (Officer C.H. Bradley) called him shortly thereafter, he said he would "[t]ry to get it

---

1. Tello has been separately tried and convicted.

2. Greenberg also raised an entrapment defense, and, through his adoption of Bradley's brief, apparently presses his claim on appeal. We find no basis for recognizing it, however, for reasons that will be evident from our treatment of the claim asserted by Bradley.

3. Constanza, although apparently available, was not called as a witness by any party.

within an hour." He was unable to do so. "[W]ithin minutes" he appealed to his "close friend" John Bradley, who was a former user, to supply the drug. Bradley told him he was crazy and refused to help.[4]

His first contact with John Bradley, according to Brenner, was made on either Tuesday, July 9, or Wednesday, July 10. Brenner tried calling others, but his attempts to set up a deal did not work out. He called Bradley again on Thursday, and, again, Bradley refused to help. On Friday, increasingly nervous about his ability to pull off the deal, Brenner visited Constanza in prison, asking to let the matter drop, but Constanza again threatened him, saying he would "break his ... head" if he did not complete the deal by the following Tuesday. That same day, Brenner once again called Bradley, allegedly telling him for the first time that he was trying to arrange this deal only because he was being threatened by someone he had known in prison. Upon hearing this, Bradley finally succumbed, saying he would make some phone calls on Brenner's behalf. Eventually Bradley told Brenner the deal could go through on July 16, and it did.

Defendant Bradley testified to the same purport. He was distressed, he said, and could not bear to think of harm coming to his friend Brenner. This solicitude was matched by his generosity: he would not expect any payment. In spite of this account, the court refused to allow John Bradley to claim an entrapment defense.

■ Since, in view of his arrangement with C.H. Bradley, Constanza is considered an "agent" whose actions are properly chargeable to the government, *see United States v. Annese,* 631 F.2d 1041, 1047 (1st Cir.1980), we can agree with defendant Bradley that the evidence of Constanza's conduct towards Brenner supported the jury's acceptance of Brenner's claim of entrapment. Bradley asks, why should not this conduct equally apply to him, to whom it was relayed, and who was influenced

accordingly? The government counters, citing cases from many circuits, that it is a commonly accepted principle that a defendant cannot claim entrapment by acts of third parties. *See, e.g., United States v. Leroux,* 738 F.2d 943, 947–48 (8th Cir.1984) (collecting cases). *But cf. United States v. Valencia,* 645 F.2d 1158, 1168 (2d Cir.1980) (2–1 decision), *post.* Both answers are simplistic, and are best viewed after an analysis of the reasons why entrapment is recognized as a defense. On so doing it is readily apparent that the basic components may be as diverse as Bradley's and the government's contentions suggest. In part this is because there are practicalities as well as what might be termed ethical principles.

We start with a given: The defendant would not have committed this particular crime had it not been for the government activity. It is offensive that the government should turn law-abiding citizens into criminals. At the same time, the defendant *did* commit a crime and, depending upon the degree of the inducement, his character fell short of what is socially mandated. Most crimes are the result of an inducement of one sort or another; from Adam onward temptation has not been a per se excuse. Is what is peculiarly repugnant about entrapment the government agent's own conduct, or that an apparently innocent citizen has become a criminal at government instigation? Into this mix must, of course, be put the fact that certain serious crimes, "victimless" in the sense that no party wishes disclosure, cannot be effectively investigated without significant governmental involvement in illegal activities. *See, e.g., Hampton v. United States,* 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring); *United States v. Porter,* 764 F.2d 1, 8 (1st Cir.1985).

■ The tension among these various concerns is reflected in the complexity of

---

4. It is not entirely clear why Bradley hesitated at first. According to Brenner, Bradley told him he "was out of [his] mind to even attempt such a big deal," suggesting that his hesitance might have been more the "circumspection of the criminal" rather than the "conscience of the upright." *Kadis v. United States,* 373 F.2d 370, 374 (1st Cir.1967). Other testimony, however, supported Bradley's claim that he wanted nothing to do with cocaine under any circumstances.

the courts' analyses of the entrapment question. With respect to the entrapment defense per se, the focus is clearly on " 'the intent or predisposition of the defendant to commit the crime.' " *Hampton v. United States*, 425 U.S. 484, 488, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976) (plurality opinion) (quoting *United States v. Russell*, 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973)). Only after the defendant has made a threshold showing that "a government agent turned him from a righteous path to an iniquitous one" does the burden of disproving entrapment shift to the government. *United States v. Coady*, 809 F.2d 119, 122 (1st Cir.1987).

■ To this there is one exception. Even a willing defendant may claim a violation of due process if the government's conduct has reached a " 'demonstrable level of outrageousness.' " *United States v. Porter*, ante (collecting cases and quoting *Hampton v. United States*, 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring)).[5] Mainly these cases involve alleged overinvolvement on the government's part in manufacturing the crime. *E.g., Hampton,* ante; *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978). Even here, a defendant may be barred from claiming outrageousness if he has been too active himself. *See United States v. Arteaga*, 807 F.2d 424, 427 (5th Cir.1986). But, of course, outrageous conduct may take other forms, and might well be found in a threat of serious physical harm. No such threat, however, was directed to John Bradley, and he has no claim.

Bradley argues, whether with respect to due process, or to entrapment, that the government, having started improper activity, should be responsible for its continuation, to the extent that anyone further was corrupted. He overstates his case, however, when he says that the "government's highly improper inducement ... could be expected to coerce (if indirectly) parties other than the intermediary into criminal involvement." Apart from what is comprehended in the words "if indirectly," instructing Brenner to obtain drugs for Charlie neither orders him to entrap someone, or, in itself, expects it. A quite different case would be presented if Constanza had targeted a putative seller and had instructed Brenner to put the arm on him.[6] Here, even though Brenner had been wrongfully entrapped, it by no means followed that he would seek to entrap an innocent third party. Obviously, there are many willing sellers. Further, defendant's repeated contention that "the inducement of Bradley was the same as that which induced Brenner" is quite incorrect. Brenner could claim duress, Bradley only an appeal to sympathy, which he was free to reject.

Not only is the government's conduct attenuated in undesignated third-party cases, but there are serious practical difficulties introduced as well. From a practical standpoint, the government's ability to challenge a one-step-removed defendant is greatly reduced. When a transaction is between the government agent and the defendant, the government typically has the testimony of the agent as against the defendant's. When the issue is whether an entrapped intermediary entrapped the defendant, the government is a stranger to the entire transaction. Indeed, all witnesses will likely be hostile. *Cf. United States v. Valencia*, 645 F.2d 1158, 1178 (2d Cir. 1980) (Van Graafeiland, J., dissenting) (cit-

---

5. We have substantial doubt whether this issue was properly preserved for this appeal. Entrapment and due process are distinct types of claims, and raising the one does not, of itself, raise the other. *Cf. United States v. Johnson*, 565 F.2d 179, 182 (1st Cir.1977), *cert. denied*, 434 U.S. 1075, 98 S.Ct. 1264, 55 L.Ed.2d 780 (1978). Moreover, the due process claim is for the court, not the jury, *see id.* at 181–82, and when the court in the present case responded to the United States Attorney, "Well, I don't think it outrageous, but that is not for me—" defendants took no further steps. At oral argument, however, the government conceded that the point was saved, so we will consider it.

6. We suggest that such a case, though argued to be a third-party case, is not really a third-party case at all. The intermediary in such instance is really acting under instructions, as a government subagent—a quite different situation. *Cf. United States v. Myers*, 692 F.2d 823, 840 n. 13 (2d Cir.1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983).

ing Park, *The Entrapment Controversy*, 60 Minn.L.Rev. 163, 241 (1976)).

In this circumstance we must come to a question of social policy. Is entrapment so offensive that every defendant who has committed a crime at the instigation of some third party, not a government agent, to be given a free shot, so to speak, without fear of refuting testimony? Entrapment is socially created, and should be socially appraised. Contraband offenses are particularly difficult to investigate, *Porter*, 764 F.2d at 8, and are increasingly recognized as one of the nation's most serious problems. They do not present a situation where courts should be quick to recognize excuses. Weighing the various considerations, we decline to follow the divided opinion in *United States v. Valencia*, ante, and would not extend the defense to a remote defendant without, at least, a showing that pressure had been put upon him by the intermediary at the instruction of the government agent. Short of that, a person who sells to a non-government representative should bear the normally understood risks of criminal conduct.

We have considered and found without merit the remaining arguments of Bradley and Greenberg—on sufficiency of the evidence, the court's handling of questions from the jury, and the admission of co-conspirator hearsay under the standard set forth in *United States v. Petrozziello*, 548 F.2d 20 (1977); *see also United States v. Baines*, 812 F.2d 41 (1st Cir.1987); *United States v. Silvano*, 812 F.2d 754 (1st Cir. 1987). The arguments of Brooks, however, require more extensive discussion. Brooks claims that he was prejudiced by the court's confusing comments on one aspect of the evidence against him and that the evidence was insufficient as a matter of law. Brooks, the driver of the limousine, had returned to the front seat after opening the rear door for Agent Bennett. The front and rear compartments of the vehicle were separated by what was termed a "privacy window," an opaque panel that could be raised (closed) or lowered (opened) by means of a switch located in the rear of the car. When the window was in the "up"

position, Brooks presumably would have been unable to hear the conversation taking place in the rear compartment.

Agent Bennett and Defendant John Bradley, both of whom had been seated facing the rear of the car, testified about the events taking place just before Bennett and Greenberg began to discuss the cocaine purchase. According to Bennett,

> As soon as we got in the limo, as we were seated, an electric window that was—that separates the driver's compartment from the rear was lowered, at which time I looked over my shoulder in this manner, and I was admiring the limousine to Mr. Greenberg ... and he said, let's go for a ride, and the limousine started to move, at which time I adamantly refused to leave the parking lot. I said let's stay right here, at which point Mr. Brooks, operating the limousine, stopped the limousine approximately 25 yards or so from our vehicles, myself and Mr. Bradley's vehicle.

On cross-examination by Brooks' counsel, Bennett said that she did not recall anyone else in the car telling Brooks to stop—when she said that she did not want to go further, the car "stopped right there." She also said that she had looked over her shoulder when the window made an electric "zhzhzh" sound as it went down. At no point did she testify—although she was not asked directly—whether she heard the window returning to the "up" position.

Defendant John Bradley offered a somewhat different version:

Q. Did the window ever go down?

A. Yes, it did.

Q. Approximately when did it go down?

A. It went down after they had—during the end of the idle chitchat, and they had said how's about going for a ride.

\* \* \* \* \* \*

Q. Did anyone respond to that question?

A. Kathy Bennett said that she did not want to go for a ride, and with that, Howie [Greenberg] ... put a switch down and had the window go down, and Brooks was starting to pull away, and he

syas [sic], 'Just pull the car up a little bit and park it,' and as he was saying that, he hit the switch again.

Q. And what happened?

A. Put the window back up.

Q. Later on did he put the window down again?

A. Not that I know of.

The jury also heard testimony on this issue from two members of the backup force who participated in the defendants' arrest. One of them testified that as he approached the limousine and looked through the front windows he could see Brooks but could not recall being able to see through to the rear compartment. A second officer testified that he was sure that the privacy window was in the up position as he approached the car to assist in the arrest. He also testified that as he drove the limousine back to headquarters he searched the driver's compartment unsuccessfully for a switch controlling the window.

In the charge to the jury, the court commented on this evidence as follows:

Well, *if that window were up throughout the entire time, I think it would be fair to conclude that the driver up front couldn't tell what was going on in the back,* and if he didn't know what was going on in the back of the limousine, how did he know that this was a transaction in cocaine? if you find from other evidence that a transaction in cocaine was occurring in the back seat.

... So the significance of that window being down is relevant ... especially in the case against Mr. Brooks.

....

Rather obviously ... *if the window was up while there was discussion of the cocaine transfer in the rear seat, the government's case against Mr. Brooks has more substance to it than it would if the window were up,* you see. When the window is up he can't hear, presumably, what is going in the back seat....

Now, if he could hear the conversation, does it follow that he therefore know or therefore should be convicted here? Not

at all. *I am not telling you that if the window was up, it follows that he is guilty.* Certainly not. There are many other issues in this case. *The mere fact that it was up doesn't mean that he could hear what was being said.*

In the bench conference immediately thereafter, counsel for Brooks noted the erroneous references to the position of the window:

Your Honor, one of the points, judge, that—I know it was done inadvertently. You said with the window up, he couldn't [—] I mean, with the window down, he couldn't hear; with the window up, he could hear. You had up and down reversed, I believe, when you were instructing the jury.

Nevertheless, the court gave no clarifying instruction.

 If the jury believed that Brooks was fully aware of the cocaine transaction occurring in the back seat, the evidence against him was clearly sufficient to support the conviction for aiding and abetting. Added to the testimony about the transaction itself were (1) a loaded gun, discovered under the armrest in the driver's compartment, with a round in the chamber and the safety turned off, and (2) testimony from various witnesses describing Brooks' damaging of two police cars as he swerved forward and back in an apparent attempt to escape from the unmarked police cars that had closed in for the arrest. Assessing this evidence and reasonable inferences "in the light most favorable to the government," *e.g., United States v. Cintolo*, 818 F.2d 980, 983 (1st Cir.1987) (collecting cases), a rational jury could find beyond a reasonable doubt that Brooks " 'in some sort consciously associate[d] himself with the venture, that he participate[d] in it as in something that he wish[ed] to bring about, that he [sought] by his action to make it succeed.' " *United States v. Francomano*, 554 F.2d 483, 486 (1st Cir.1977) (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 769–70, 93 L.Ed. 919 (1949)). In reaching this conclusion, however, we view the evidence about the posi-

**10**

tion of the window as an important element of the government's case.

■ Although we regard this as a close question, we find that Brooks' conviction should be affirmed. It is "axiomatic that the charge must be taken as a whole." *United States v. Caron,* 615 F.2d 920, 921 (1st Cir.1980); *see also, e.g., United States v. Morris,* 700 F.2d 427, 433 (1st Cir.1983), *cert. denied,* 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306; *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). The court's comments were, on the whole, quite favorable to Brooks in focusing the jury's attention on the window evidence and encouraging them to acquit Brooks if they found that the window was closed. The transposition of the words "up" and "down," while perhaps momentarily confusing to the jury, would not inhibit their ability ultimately to assess the evidence and consider the central question of whether Brooks could hear the conversation in the rear compartment. The court repeatedly admonished the jury to rely on their own recollection of the evidence, and not its own, in reaching their verdict. When informed of the possible transposition error, the court, possibly uncertain whether the error was made at all, had to decide whether to add further to the already extensive comments about the window, which would overemphasize the point and risk even further confusion about which way was up. Although, in retrospect, we believe that a corrective instruction might have been the better course, we do not find its omission sufficient grounds for a new trial.

*Affirmed.*