# United States Court of Appeals

## For the First Circuit

No. 03-1470

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT C. LUISI, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Lynch, Circuit Judge,
Selya, Senior Circuit Judge,
and Howard, Circuit Judge.

John H. LaChance for appellant.
Cynthia A. Young, Assistant United States Attorney, with
whom Michael J. Sullivan, United States Attorney, was on brief,
for appellee.

April 10, 2007

**LYNCH**, **Circuit Judge**.  Defendant Robert C. Luisi, Jr., an admitted member of the "La Cosa Nostra" (LCN) crime family, appeals his convictions on three cocaine-related charges.  These convictions stemmed from an FBI investigation that employed a paid cooperating witness and LCN member, Ronald Previte.

At trial, Luisi testified and admitted his involvement in the cocaine transactions.  His defense was entrapment, on intertwined theories.  He claimed that Previte, acting for the government along with undercover FBI agent Michael McGowan, had improperly tried to induce him to commit drug crimes.  He further claimed that when he resisted, Previte persuaded Philadelphia LCN boss Joseph Merlino to order Luisi to engage in the charged drug transactions.  Merlino was Luisi's superior in the LCN, and the government was aware of the serious consequences Luisi would face if he refused to follow Merlino's order.

The district court instructed the jury on the entrapment defense.  However, the court's supplemental instructions -- given in response to a jury question -- foreclosed the jury from considering Merlino's role in the asserted government entrapment of Luisi.  We conclude that those instructions were erroneous, and we vacate the convictions and remand the case.

I.

In July 1999, a grand jury in the District of Massachusetts indicted Luisi and three co-defendants on three

charges: one count of conspiracy to possess cocaine with intent to distribute, see 21 U.S.C. §§ 841(a)(1), 846, and two counts of possession of cocaine with intent to distribute, see id. § 841(a). The conspiracy was alleged to have run from February 1999 through June 28, 1999. The two possession counts stemmed from transactions on April 30, 1999, and June 3, 1999.

Pursuant to plea agreements with the government, two of Luisi's co-defendants pled guilty to the possession counts. The indictment against the third was dismissed following that defendant's death, leaving Luisi as the sole defendant at a trial that commenced on September 9, 2002. We recount the key testimony.

In the late 1990s, the FBI conducted a major investigation into the operations of the Philadelphia LCN. Previte, a captain or "capo regime" in the LCN, assisted the FBI investigation by working as a cooperating witness under a personal services contract with the FBI. He was paid a substantial sum of money in return.

The FBI came to learn that Luisi was working for the Philadelphia LCN as a captain, and that he was supervising the criminal activity that the organization undertook in Boston. Eager to get evidence against Luisi, the FBI had Previte introduce Luisi to McGowan, who posed as a source of illegal money-making opportunities.

The introduction took place over January 11th and 12th, 1999. McGowan operated under the pseudonym "Michael O'Sullivan" and purported to be in the import/export business. He told Luisi he had previously worked with Capo Previte in Philadelphia, and said he had now relocated to Boston. McGowan explained to Luisi that as part of his business he was sometimes presented with "opportunities" and that sometimes he needed help taking advantage of these "deals." Luisi agreed that he would look at future deals with McGowan. Unbeknownst to Luisi, this conversation was being recorded by the FBI -- as were the vast majority of the future conversations Luisi would have with McGowan.

The first "opportunity" occurred on February 10, 1999, when McGowan presented Luisi with several "stolen" furs. Luisi was not sure if he would be able to sell them, but he stated he would look into it. He also inquired whether McGowan had other items; when McGowan mentioned the possibility of obtaining jewelry, Luisi expressed more interest in that, and particularly in diamonds. There was no mention of any drugs at this point.

Several days later, Luisi and Previte spoke to each other at a party in Philadelphia. Merlino was also present at the party. Luisi testified that Previte proposed a "swap" of cocaine for diamonds, and that Luisi's response was that he would "try" to get the deal done. He testified that he gave this response because "at the party [Merlino] . . . made it very clear to me that he wanted

these drugs," although Luisi later clarified that he did not at that time understand Merlino to be giving an "order" to do the deal, but merely "permission." That would change. In any event, Luisi testified that at or shortly after the party he chose not to do the deal.

On March 8, 1999, McGowan again met with Luisi, along with two of Luisi's associates.[1] McGowan referred to Previte's proposed swap and stated that he (McGowan) knew a guy with diamonds, and that the guy was looking to exchange them for "three bricks."[2] Luisi's immediate response was: "I want to get them, I want to bring them to [a jeweler friend of mine], if he likes it, boom. We'll do the deal and I'll do it that way, whatever [Previte] wants." McGowan interpreted this to mean that Luisi wanted to see the diamonds, and that he would be willing to exchange cocaine for them.

Several minutes later, however, Luisi took McGowan aside privately. This part of the conversation was not recorded. According to McGowan, Luisi told him that because Previte had referred McGowan to him, Luisi would make "every effort" to get the

---

[1] We use the term "associate" in its ordinary colloquial meaning. Luisi testified that the word "associate" conveys a particular status within the LCN; we do not use the term in that sense.

[2] McGowan testified that "brick" was code for "cocaine." Luisi disputed that, testifying that his initial understanding was that a "brick" referred to heroin, and that it took him a few minutes to realize that McGowan was referring to cocaine.

cocaine, but it would be difficult and it would take time. Luisi testified that he did not actually agree to do a drugs-for-diamonds swap.

Also during the March 8th conversation, McGowan asked Luisi what items, other than the diamonds, he would be interested in. Luisi responded that he would be interested in jewelry, watches, and cigarettes, and some of his associates mentioned film and razor blades.

McGowan's next meeting with Luisi and his associates came on March 11, 1999. McGowan had some "stolen" Polaroid film, and the participants discussed how it was to be sold. Luisi reported on his only partially successful attempts to sell fur coats, and the participants also discussed diamonds and jewelry. Later during the meeting, McGowan mentioned that Previte was coming up to Boston in a few days, and Luisi agreed to meet with both Previte and McGowan then. Luisi and his associates left with the film.

Previte came to Boston, and on March 16, 1999, he met with McGowan, Luisi, and some of Luisi's associates. The participants had a cryptic conversation during which, according to McGowan, Luisi confirmed that he would get the cocaine-for-diamonds deal done. The following day, McGowan talked to Luisi over the phone, and again inquired into the status of the cocaine deal with Previte. Luisi replied that he would work on it, but indicated that the deal would not happen immediately.

During this time, Luisi had also been trying to sell the film that McGowan had given him on March 11th. He was unable to do so at a price that McGowan was willing to accept, and so on March 19th Luisi returned the film. After Luisi again expressed his preference for jewelry, and after McGowan again reaffirmed his ability to get jewelry, the conversation turned back to the proposed diamonds-for-cocaine deal. Luisi made comments that, if taken at face value, expressed a reluctance to go ahead with the deal and indicated that Luisi had "nothing to do with" the cocaine business. Luisi also explained to McGowan that "in the last . . . three years I lost over a dozen and a half guys to that. . . . And I have to make a stern, a firm stand here. . . . I don't wanna have nothing to do with it."

Luisi then said that he would send a guy named Danny White, not affiliated with Luisi, to do the deal. Luisi told McGowan that once White made contact with McGowan, McGowan would have exactly seven days to complete the transaction. Luisi and McGowan also discussed cash terms for the deal (even though the deal had originally been conceived of as a barter for diamonds).

Luisi testified that Danny White actually is a fictitious person whom Luisi made up in order to pretend that he was cooperating with McGowan.[3] McGowan testified that he never met

_____

[3] On the tapes, it is actually McGowan who first refers to "Danny," and he states that he had heard about White from Previte. However, a jury could conclude that Previte had first heard about

-7-

White at any point, that he never had any conversation with him, and that he did not know whether White was a fictitious person or not.

Luisi and McGowan had no contact with each other for the next three weeks.[4] On April 19, 1999, McGowan initiated a phone conversation with Luisi. McGowan turned the discussion to dealings with Previte, and Luisi responded that "[e]verything's gonna be okay soon." McGowan understood this to be a reference to the cocaine transaction.

McGowan initiated another phone conversation with Luisi on April 23, 1999. McGowan told him that Previte would be coming to Boston on April 28th, and he asked Luisi to be available then. Luisi said he would probably be available, and he also said "I'm ah gonna be calling you ah with my other friend any day." McGowan interpreted the "other friend" to be a reference to Danny White. In the same phone conversation, McGowan mentioned that he might soon have more stolen property coming in.

On April 27, 1999, one day before Previte's planned trip to Boston, Previte had a conversation with Merlino, his superior in the LCN. Previte was wearing a wire, and the conversation was recorded. As revealed by the tape, Previte complained to Merlino

Danny White from Luisi.

[4] McGowan testified that this was due to the fact that Luisi was out of town for one week, and that McGowan had informed Luisi he would be out of town for the two weeks after that.

that Luisi had not yet done the cocaine transaction, despite Luisi's representations. Previte explained to Merlino that he had "big money sittin[g] on the line," and that Merlino would also make money from the transaction. He directly asked Merlino if there was "any way you could just tell [Luisi] to do what he gotta do." Merlino agreed to do so. Previte and Merlino then agreed that when Previte went to Boston the next day, Previte would put Luisi on the phone with Merlino, at which point Merlino would tell Luisi to do the cocaine deal. As Merlino put it on the tape: "I'll say [to Luisi:] whatever [Previte] says to do[,] just do it."

Previte was still cooperating with the FBI at the time he had the conversation with Merlino, and a jury could conclude that the FBI had in fact directed Previte's request of Merlino. Previte did not testify, nor did any of the Philadelphia FBI agents who had worked with him. But McGowan was asked if the FBI had arranged the meeting between Previte and Merlino, and his response was that while he did not know, he "assume[d] so because Previte was cooperating."

Previte flew to Boston on the morning of April 28th, the day after his conversation with Merlino. He went to McGowan's office, and McGowan arranged for Previte to make a three-way call with LCN boss Merlino and Capo Luisi, Merlino's underling. The call was recorded in its entirety. It began with Previte calling Luisi. Once Luisi was on the line, Previte brought Merlino into

the conversation.  After an exchange of preliminaries, Merlino (somewhat cryptically) got down to business.[5] Luisi testified that he understood Merlino to be ordering him to get the cocaine deal done, and that he agreed to do the deal as a result of this.

McGowan, who had been listening in to the conversation, testified to having a similar understanding.  As he put it, "[a]fter this phone conversation, I expected to receive cocaine." His hopes were soon realized.

Within an hour after Merlino spoke to Luisi, Luisi met with Previte and McGowan to confirm details of the drug transaction.  Initially, Previte and Luisi had a private conversation to work out certain points, and Previte explained that McGowan wanted to do multiple cocaine deals.  Luisi agreed, and the

_____

[5] As recorded, the relevant portions of the conversation were as follows:

> Merlino: Bob, can that guy, you know, do what he's got to do over there for him?
>
> Luisi: Oh, yeah.
>
> Merlino: All right.
>
> Luisi: Yeah, that's, that's gonna, ah, that's gonna be.
>
> Previte: Okay.
>
> Merlino: All right.
>
> Luisi: You know?
>
> Merlino: You got it.

private conversation ended shortly thereafter.  With Luisi looking on, Previte then informed McGowan that the mysterious Danny White would not be playing a role in the deal, and that his place would be taken by Shawn Vetere, one of Luisi's associates.  Vetere promptly put McGowan in touch with Bobby Carrozza.[6]  McGowan worked out more details with Carrozza.  On April 30, 1999 -- two days after the call with Merlino -- Carrozza sold two kilograms of cocaine to McGowan.  Carrozza told McGowan that the cocaine came "right from [Luisi and Vetere].  I wouldn't be able to do it any other way."

Two weeks later, McGowan gave Luisi a $1,000 "tribute" payment for arranging the transaction.  McGowan and Luisi also engaged in preliminary discussions about a future cocaine deal, and Luisi told McGowan to work the rest out with Carrozza. McGowan did so.

The next cocaine delivery was not immediately forthcoming, however.  On May 24, 1999, McGowan complained to Luisi, who told him to be patient.  On June 1, 1999, Luisi proposed certain changes to the impending cocaine transaction; McGowan agreed to the revised cocaine deal the next day, and he paid Luisi the $24,000 cash price.  On June 3, 1999, Carrozza and Tommy Wilson

---

[6] Carrozza's exact relationship to Luisi is somewhat unclear, but there was testimony suggesting that Carrozza was in some way affiliated with the LCN.  There was also evidence that Carrozza worked directly with Luisi and Vetere.

(another of Luisi's associates) came to McGowan's office to deliver one kilogram of cocaine.  McGowan later gave Luisi a $500 "tribute" payment for arranging the deal.[7]

Luisi was the sole witness to testify for the defense. He testified to several additional pertinent points.  He admitted that he had been a captain in the LCN since the fall of 1998, and he agreed that the LCN was properly described as "the Mafia" and as "the mob."  As a captain, one of his jobs had been to make "tribute" payments to Merlino, and these payments had come out of Luisi's earnings from the criminal enterprises conducted by his "crew" in Boston.  Luisi explained that the LCN was extremely hierarchical,  and he stated that when the head of the LCN ordered him to do the cocaine transaction, he felt that he had no alternative other than to fulfill the order.  He was also asked why he had engaged in the second cocaine transaction; while he did not specifically reference Merlino's order, he responded that he had not wanted to do the drug deal, and he did so because he "had to bring money to Philadelphia" and so he "was desperate."

Luisi admitted that at one point in his life he had been involved in drug distribution.  However, he testified that he stopped his involvement in that business when he joined the LCN in

---

[7] A third cocaine transaction was also negotiated, but it was never fully executed.  On June 25, 1999, Luisi informed McGowan that the supply of cocaine had tightened and that things would be "dead" for a while.  Luisi was arrested three days later.

mid-1998, and he gave several reasons for this.  At the time Luisi joined, Georgie Borghesi (another LCN captain) and Merlino both told Luisi that he was not to deal drugs.  Additionally, Luisi testified that around that time he had a "spiritual encounter," and he realized that his "whole lifestyle was wrong."  Because he was an LCN captain, he found it difficult to realize fully his spiritual aspirations, but he testified that he was at least partially able to implement them by ending his involvement with drugs as of late 1998.[8]

Luisi also offered an explanation for why he had seemed receptive to the cocaine deal, even before receiving the order from Merlino on April 28th.  He claimed he had been trying to "pal off" McGowan and Previte; that is, he politely pretended to be cooperating with them on the drug deal, while in fact he had no intention of ever delivering drugs to them.

Before the jury was instructed, Luisi's attorney asked the district court to dismiss the case on the ground that the government had engaged in allegedly outrageous conduct, thereby violating Luisi's due process rights.  The court never ruled on

---

[8] On cross-examination, the government attempted to impeach Luisi by suggesting that the spiritual encounter was not genuine. Luisi admitted that at least one member of his crew had been "dabbling" in cocaine even after Luisi claimed to have ceased his involvement with drugs.  Luisi also admitted that he was aware of this "dabbling," and that he shared in the profits that resulted from it.  Luisi did say that the drug quantities involved in this "dabbling" where much smaller than the quantities involved in the deals with McGowan.

that motion; such a motion is an issue for the judge and not the jury.  See United States v. Bradley, 820 F.2d 3, 7 n.5 (1st Cir. 1987).  However, over the government's objection, the district court did agree that Luisi was entitled to an entrapment instruction.

The district court's entrapment instructions correctly informed the jury that the government had the burden to prove, beyond a reasonable doubt, that Luisi had not been entrapped.  See United States v. Walter, 434 F.3d 30, 37 (1st Cir. 2006).  The district court further explained that the government had to prove, beyond a reasonable doubt, that at least one of two things was true: either (1) "no government agent[9] or person acting on behalf [of] or . . . under [the] auspices of the government persuaded or induced the defendant to commit" the charged crimes; or (2) "the defendant was ready and willing to commit the [charged] crime[s] without persuasion from the government."  This was also a correct statement of the law.  See United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998) (explaining that the two prongs of an entrapment defense are improper government inducement and lack of predisposition).

Luisi specifically asked for an instruction indicating that if the jury found that Previte had induced Merlino, that meant

_____

[9] The district court did not provide a definition for the term "government agent."

that Merlino's order could be considered government action.  The district court refused, stating that the instruction was improper because there was a factual dispute over whether the government's responsibility ended due to the presence of an intermediary.

Shortly after commencing deliberations, the jury sent the court a question that revealed it was considering Merlino's role and how it related to the entrapment defense.  The jury asked: "Is Merlino's request of Luisi, if determined to be excessive pressure, considered to be government persuasion or inducement because the contact between Merlino and Luisi resulted from the government agent Previte and Merlino?"

The court and the parties researched the issue overnight, and returned in the morning to discuss the proper response.  Luisi contended that because Previte had spoken to Merlino about the cocaine transaction, and because Merlino's order had been facilitated by Previte and McGowan (the latter of whom had actually placed the three-way call to Merlino), the actions of Merlino, Previte, and McGowan together could be attributed to the government.  The government disagreed, and based its argument on a case from outside this circuit, United States v. Washington, 106 F.3d 983 (D.C. Cir. 1997).  The government described Luisi's asserted defense as "derivative entrapment," and it claimed that Washington was the only case it could find recognizing the defense.

As the government read Washington, Luisi's claim was foreclosed on the facts presented.

The court took a different route, and it ultimately concluded that a case from this circuit, United States v. Bradley, was controlling. In Bradley a prison inmate named Constanza, who could have been deemed to have been acting as a government agent, directly threatened an intermediary named Brenner to do a drug deal on pain of physical harm. 820 F.2d at 5-6. The intermediary was unable to do the deal on his own, and he in turn pressured his friend -- the defendant Bradley -- to assist him. See id. at 7-8. We found the evidence sufficient to support an entrapment instruction for the intermediary Brenner, as the government agent had directly threatened him. Id. But we held that Brenner's friend, defendant Bradley, was not entitled to an entrapment instruction: while Brenner could claim duress, Bradley had "only an appeal to sympathy, which he was free to reject." Id. at 7. We stated that we "would not extend the [entrapment] defense to a remote defendant without, at least, a showing that pressure had been put upon him by the intermediary at the instruction of the government agent." Id. at 8.

Thus in Bradley this court rejected defendant Bradley's argument that the government's improper inducement of Brenner could be an indirect entrapment of Bradley, as the agent (Constanza) had neither ordered nor expected Brenner to entrap other persons. See

id. at 7. We said that a "quite different case would be presented if Constanza had targeted a putative seller and had instructed Brenner to put the arm on him." Id. We then added a footnote to "suggest that such a case, though argued to be a third-party case, is not really a third-party case at all. The intermediary in such instance is really acting under instructions, as a government subagent -- a quite different situation." Id. at 7 n.6.

The district court focused upon Bradley's use of the word "instructions," and it read that case as concerned with whether the government agent (Previte) had "instructed" the intermediary (Merlino) to pressure Luisi. The court concluded that because Previte ranked below Merlino in the LCN hierarchy, Previte was in no position to "instruct" Merlino to do anything.

Although Luisi argued for a broader reading of the word "instruct," the district court rejected such a reading of Bradley. In the alternative, Luisi asked that the jury be allowed to determine whether Merlino had been "instructed," but the court rejected that option as well.

The district court then called the jury back into the courtroom and answered the jury's question as follows:

> [I]n your consideration of the entrapment question, you should focus your attention on the relationship -- the direct relationship between Mr. Previte . . . and Mr. McGowan on the one hand, and Mr. Luisi on the other hand. You should consider evidence as [it] relates to the direct contact between and among those people.

-17-

Because the district court omitted Merlino from this statement, while simultaneously mentioning other individuals, the jury likely concluded that it could not consider Merlino's role in any inducement of Luisi. This was particularly so since the jury's question specifically asked about Merlino, and the court told the jury to focus on individuals other than Merlino. As a result, and as the government has not disputed, the jury was precluded from finding that Merlino's order to Luisi could be deemed improper governmental inducement.

Later that day, the jury convicted Luisi on all three counts of the indictment.

## II.

Luisi's primary contention on appeal is that the district court's jury instructions, as supplemented by its answer to the jury's question, were incorrect as a matter of law. We review that issue de novo here. See United States v. Buttrick, 432 F.3d 373, 376 (1st Cir. 2005).

We agree with Luisi that the district court's instructions were erroneous. We begin by explaining the nature and policies behind the entrapment defense generally. We address Bradley, and conclude that it supports Luisi's claim of error. We also reject the government's alternative argument, which we review de novo, that there was no reversible error on the facts presented because Luisi was not entitled to any entrapment instruction

whatsoever.  See United States v. Nishnianidze, 342 F.3d 6, 17 (1st Cir. 2003) (stating that a defendant is entitled to a jury instruction so long as his legal theory is valid and there is evidence in the record to support it).

A.          Understanding the Entrapment Defense

In federal criminal cases, the entrapment defense is neither a doctrine of constitutional dimension, nor a defense specifically granted by statute.  See United States v. Russell, 411 U.S. 423, 432-33 (1973).  Rather, the defense has its origins in an inference about congressional intent.   Sherman v.  United States, 356 U.S. 369, 372 (1958); see also United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994).  The Supreme Court has explained that the "function of law enforcement is the prevention of crime and the apprehension of criminals.  Manifestly, that function does not include the manufacturing of crime. . . . Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations."  Sherman, 356 U.S. at 372.  A successful entrapment defense requires that there be a reasonable doubt on both prongs of a two-pronged test.

The first prong necessitates a showing of improper government inducement.  See Gamache, 156 F.3d at 9.  This aspect of the defense plainly seeks to deter improper government conduct. Gendron, 18 F.3d at 961.  Indeed, a defendant cannot claim entrapment when government conduct played no causal role in the

-19-

defendant's inducement. See Sherman, 356 U.S. at 372. Nevertheless, the entrapment defense only deters government misbehavior in cases where the defendant would otherwise be law-abiding. Gendron, 18 F.3d at 962. That is because the second prong requires that the defendant have a lack of predisposition to commit the charged offense. See id.; see also Sorrells v. United States, 287 U.S. 435, 448 (1932).

These two prongs, and the policy concerns behind them, play important roles in delimiting the scope of the entrapment defense. But they are not the only considerations that matter. This court and the Supreme Court have taken account of the practical problems facing law enforcement, particularly in the prosecution of "victimless" crimes where "significant governmental involvement in illegal activities" is often required. Bradley, 820 F.2d at 6-8; see also Hampton v. United States, 425 U.S. 484, 494-5 & n.7 (1976) (Powell, J., concurring in the judgment); Russell, 411 U.S. at 432; Gendron, 18 F.3d at 961. We must be mindful that "the defense of entrapment . . . [does] not . . . give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it [does] not approve." Russell, 411 U.S. at 435.

These various considerations are sometimes in tension with one another, and we have treated the resolution of questions about the scope of the entrapment defense as essentially exercises in balancing. Indeed, in Bradley we weighed the competing factors

-20-

and realized that we ultimately faced "a question of social policy." 820 F.2d at 8. Cf. United States v. Hollingsworth, 27 F.3d 1196, 1198 (7th Cir. 1994) (en banc) (characterizing entrapment as a "common law doctrine").

We synthesize the key facts on which we must balance competing concerns in this case. It is beyond dispute that an individual like Previte, hired by the government as an informant, is a "government agent" for entrapment purposes. See Sherman, 356 U.S. at 373-75. Nor can there be any dispute that Merlino's order to Luisi, with its implied threat of physical harm or other serious retribution, could be found by a jury to be improper inducement if attributed to the government. See Gendron, 18 F.3d at 961; Bradley, 820 F.2d at 7.

It is also clear that Luisi's case does not fit the pattern of what has come to be known as "vicarious entrapment." In "vicarious entrapment" an unknowing middleman merely tells the defendant about an inducement that the government had used to target the middleman. See United States v. Valencia, 645 F.2d 1158, 1168-69 (2d Cir. 1980) (recognizing the vicarious entrapment defense). Here, the target was not the middleman Merlino, but the defendant Luisi. Further, a jury could find that Merlino had himself threatened Luisi. This was not a case where Merlino repeated to Luisi a threat that Previte had made against Merlino. Indeed, Previte did not threaten Merlino at all.

-21-

Instead, this case is much closer to what has been called "derivative entrapment," a situation in which a government agent "uses the unsuspecting middleman as a means of passing on an inducement" to the defendant. 2 W. LaFave, Substantive Criminal Law, § 9.8(a), at 93 (2d ed. 2003).[10] Yet even within this category, further refinement is required.

We have before us a situation in which a jury could find that Previte specifically targeted Luisi, and then "induced" Merlino to give an order to Luisi when Merlino might not have otherwise done so. But Previte's inducement of Merlino does not appear to have itself been improper. Previte simply helped set up a drug transaction, explained to Merlino that Merlino would profit from the transaction's execution, and then encouraged Merlino to order Luisi's assistance. Cf. Gendron, 18 F.3d at 961-62 (explaining that improper inducement "goes beyond providing an ordinary 'opportunity to commit a crime,'" and providing examples (quoting Jacobson v. United States, 503 U.S. 540, 550 (1992))). A jury would presumably find that Previte merely provided an

---

[10] Some circuits have used a different meaning of "derivative entrapment." For example, the Seventh Circuit has used it to refer exclusively to situations in which the middleman is himself entrapped. See Hollingsworth, 27 F.3d at 1204. By contrast, the Fourth Circuit has used it to refer to all third-party entrapment cases. See United States v. Squillacote, 221 F.3d 542, 573-74 & n.19 (4th Cir. 2000). The definition we use, which comes from a leading criminal law treatise, is a broad definition that is useful in distinguishing "derivative entrapment" from "vicarious entrapment."

"ordinary" inducement to Merlino; it was Merlino's inducement of Luisi that a jury could find improper.

This is an unusual entrapment situation. Under the original, correct instructions given, it is evident that the jury was considering the possibility that Merlino had put excessive pressure on Luisi, and that the jurors were unsure whether Merlino's order could be considered "government persuasion or inducement because the contact between Merlino and Luisi resulted from the government agent Previte." The effect of the court's response was the same as if it had instructed the jury, as a matter of law, that Merlino's order could not be considered <u>government</u> inducement or persuasion. We must decide whether the issue was correctly removed from the jury's consideration.

B.        <u>Third-Party Entrapment After</u> Bradley

In this circuit, <u>Bradley</u> is the leading case on third-party entrapment. Like the district court, the government now believes that <u>Bradley</u> controls this case. We examine <u>Bradley</u>'s facts and reasoning in greater detail.

The government agent in <u>Bradley</u> was a prison inmate named Constanza. In exchange for a reduced sentence, Constanza agreed to identify drug dealers for the government to assist in undercover operations and prosecutions. <u>See</u> <u>Bradley</u>, 820 F.2d at 5. Constanza told the government about an individual named Brenner, and then he threatened Brenner with physical harm if Brenner did

-23-

not engage in a cocaine deal with an undercover agent. Id. at 5. Brenner in turn appealed to his friend, defendant Bradley, for assistance in obtaining the cocaine. Id. at 6. Though Bradley initially refused, Brenner explained that his physical safety was in jeopardy. Id. Upon hearing this, Bradley decided to assist Brenner. Id.

It should now be clear that Bradley presented a narrow fact pattern: it was a case of vicarious entrapment. That is, Brenner merely informed Bradley of a threat that had been made against Brenner, not one that had been made against Bradley. Although the Second Circuit's Valencia opinion had recognized that such a vicarious entrapment defense could be viable, we considered and rejected that position. See id. at 8. At the same time, however, we rejected the government's argument that a defendant can never be entrapped by a third party. See id. at 6-8.

Bradley reached these conclusions by weighing a variety of policy considerations as applied to the facts of the case. On the one hand was the fact that the crime would not have happened but for the government's involvement. See id. at 6. On the other hand were several factors. First, the government's role in ensnaring Bradley was "attenuated" because the agent's threat neither ordered Brenner to seek assistance nor expected it. Id. at 7. Second, Bradley acknowledged the practical difficulties for the prosecution when it is forced to refute a defendant's claim of

-24-

entrapment in a scenario where the only two witnesses -- the defendant and the intermediary -- are likely to be hostile to the government.[11]  See id.  Third, Bradley observed that the defendant did commit a crime, exhibiting socially inappropriate behavior.  See id. at 6.  Finally, Bradley noted the fact that undercover investigations are often needed to prosecute drug crimes.  See id.

The Bradley court ultimately held that it "would not extend the [entrapment] defense to a remote defendant without, at least, a showing that pressure had been put upon him by the intermediary at the instruction of the government agent."  Id. at 8.  The government reads "instruct" to mean "command," such that Previte is not responsible for Merlino's threats against Luisi unless Previte had commanded Merlino to order Luisi into the cocaine deal.  Luisi reads "instruct" to mean "convince" or "inform."  But the dispute about the use of particular language in Bradley is largely beside the point.  Bradley was a case in which the government agent neither "commanded," "convinced," nor "informed" the middleman (Brenner) to target Bradley.  Indeed, it was the lack of any government targeting of Bradley whatsoever on which Bradley relied.  See id. at 7.  Here, unlike in Bradley, the

---

[11] The case at hand does not present that concern.  There is a tape recording of the conversation in which the middleman pressured Luisi. Moreover, the government agent (Previte) in fact participated in that conversation, while another government agent (McGowan) listened in.  Consequently, the government faced fewer practical difficulties in refuting Luisi's entrapment claim.

government's actions were specifically designed to pressure Luisi, and the government in fact expected that Luisi would be pressured. Bradley thus had no occasion to consider the fact pattern at hand.[12]

In United States v. Rogers, 102 F.3d 641 (1st Cir. 1996), we considered a fact pattern that was more on point. In Rogers, the defendant did not move quickly to complete a drug transaction that an undercover agent had attempted to facilitate. Id. at 645. In an isolated statement, the government agent "told" the middleman to "put some heat on [the defendant]." Id. The agent had thus specifically targeted the defendant to receive an inducement, and Rogers relied on Bradley to conclude that the government would have been responsible if the agent had "told" the middleman "to apply the pressure or inducement later deemed improper." Id. (emphasis added) (italics removed). However, Rogers factually did not involve an agent's suggestion that improper pressure be applied to

---

[12] We also had no occasion to consider such a fact pattern in United States v. Murphy, 852 F.2d 1 (1st Cir. 1988). In that case, after we rejected the defendants' entrapment arguments, we relied on Bradley to explain why one defendant's claim to an entrapment instruction was "foreclosed for an additional reason." Id. at 6. We noted that to allow the claim "we would have [had] to create the fiction that [the government agent] forced [the intermediary] into dealing with" the defendant. Id. (emphasis added). To the extent that our use of the word "forced" can be taken to imply a requirement of coercion, such an implication was dicta, as the government agent in the case never encouraged the middleman to bring anyone into the scheme, let alone the defendant. See id.
We similarly did not deal with a pertinent fact pattern in United States v. Hernandez, 995 F.2d 307, 313 (1st Cir. 1993). Like Bradley and Murphy, the case involved no government targeting of the individual defendant. See id.

the defendant because "putting on some heat" was not improper. Rogers distinguished the more sinister suggestion of putting "the arm" on someone, a phrase that implied threatened force. Id. at 645-46.

Thus after Rogers, the law in this circuit permits an entrapment instruction involving a middleman when there is evidence that (1) a government agent specifically targeted the defendant in order to induce him to commit illegal conduct; (2) the agent acted through the middleman after other government attempts at inducing the defendant had failed; (3) the government agent requested, encouraged, or instructed the middleman to employ a specified inducement, which could be found improper, against the targeted defendant; (4) the agent's actions led the middleman to do what the government sought, even if the government did not use improper means to influence the middleman; and (5) as a result of the middleman's inducement, the targeted defendant in fact engaged in the illegal conduct.[13]

---

[13] Contrary to our precedent, several circuits categorically deny the entrapment defense in all third-party situations where the middleman is unaware that he is helping the government. See Squillacote, 221 F.3d at 574; United States v. Thickstun, 110 F.3d 1394, 1398 (9th Cir. 1997); United States v. Martinez, 979 F.2d 1424, 1432 (10th Cir. 1992). The Third Circuit's law varies. Compare United States v. Klosterman, 248 F.2d 191, 195-96 (3d Cir. 1957) (concluding that the third-party entrapment defense was available in a case where the defendant was specifically targeted and the middleman was unwitting), with United States v. Beverly, 723 F.2d 11, 12 (3d Cir. 1983) (per curiam) (failing to cite Klosterman and claiming that the third-party entrapment defense is categorically unavailable when the middleman is unwitting). With

The government reads Rogers differently. It contends that the word "told" in Rogers must mean an imperative equivalent to the government's interpretation of "instruct" in Bradley. It also reads Rogers to state a requirement that the agent have improperly induced the middleman.

We disagree. First, we think that the government's argument is contrary to the plain meaning of "told," and we see nothing in the context of Rogers that overrides this. Indeed, in concluding that the agent had not "told" the middleman to improperly induce the defendant, Rogers pointed out that "nothing in the record show[ed] that [the agent] urged, suggested or was even aware of" the middleman's improper inducement. See 102 F.3d at 645 (emphases added). Urging and suggesting are hardly equivalent to ordering, nor do they by themselves necessarily constitute improper inducement. Second, if the Rogers court had in fact read Bradley the same way as the government does, we do not see how the Rogers court could have considered it an open question whether the government can be responsible for an agent's mere knowing tolerance of improper inducement by a middleman.[14] See id.

the possible exception of the Ninth Circuit's opinion in United States v. Emmert, 829 F.2d 805 (9th Cir. 1987), we are unaware of any cases in which these circuits have rejected the third-party defense when confronted with the kind of fact pattern we face here. As for Emmert, we respectfully disagree with the Ninth Circuit's conclusions.

[14] Mere knowing tolerance is not presented by the facts here, and we do not reach that issue.

-28-

Moreover, the policy concerns discussed in Bradley support our reading of Rogers. Bradley thought it important that the government's role was "attenuated" in that case because the agent had not attempted to ensnare the defendant. Bradley, 820 F.2d at 7. But in a case where the government agent specifically targets the defendant, and then causes the middleman to take a specifically contemplated action (that is arguably improper pressure) with the goal of ensnaring the defendant, the government's role is hardly attenuated. Additionally, Bradley worried about the fact that the government had turned a potentially innocent person into a criminal, see id. at 6, though it ultimately decided that this concern was outweighed by other issues. But in Bradley the government had never attempted to induce defendant Bradley directly. Bradley's concern for potential innocents weighs heavier when the government has tried -- and failed -- to induce the defendant without the use of a middleman.

In light of our understanding of the law, we think a properly instructed jury could conclude that the government was responsible for Merlino's order to Luisi. Indeed, such a jury could decide that: (1) Previte specifically requested that Merlino order Luisi to engage in the cocaine deal; (2) Previte's request came after earlier government efforts to ensnare Luisi, without a middleman, had not been fruitful; (3) Previte, as an LCN captain, understood that the order he requested from Merlino would contain

an implied threat of death, physical harm, or serious retribution if Luisi failed to comply; (4) Merlino's order to Luisi was exactly what Previte had requested; and (5) Merlino would not have given the order if Previte had not encouraged him to do so.[15]  As a result, we think that the district court incorrectly answered the jury's question.

This result is supported by a Fifth Circuit case.  In United States v. Anderton, 629 F.2d 1044 (5th Cir. 1980), the Fifth Circuit allowed the entrapment defense in a case where law enforcement officers specifically targeted the defendant, and then put unspecified "pressure" on the unwitting middleman to bring the defendant into a pre-designed criminal scheme.  Id. at 1045, 1047.  Without discussing whether the middleman had been improperly induced, the court found it important that the criminal design originated from the government itself.  See id. at 1046-47.

Our conclusion is also supported by the D.C. Circuit's analysis in Washington.  In Washington, an undercover FBI agent posed as a drug lord and recruited a corrupt police officer to help him.  See 106 F.3d 990-91.  After paying the officer for his

_____

[15] Indeed, the jury's question was premised on the idea that the government had caused Merlino to give the order.  While the government observes that there was no evidence introduced at trial as to Merlino's lack of predisposition, none was needed.  The premise of the jury's question was perfectly consistent with a finding that Merlino was predisposed to be involved in a cocaine transaction.  See Gendron, 18 F.3d at 962 (distinguishing lack of predisposition from simple causation).

services, the agent "asked [the officer] . . . to recruit as many new officers as he could." Id. at 991. The corrupt officer agreed, see id., but then recruited the defendants with an inducement not contemplated by the undercover agent. See id. at 992, 994-95. The Washington court rejected the derivative entrapment instruction on the facts of the case. Id. at 995. Importantly, however, it held that the entrapment defense is available where the government does contemplate the improper inducement given to the defendant, and causes the middleman to give that inducement as a result of a government agent's "'instruction or direction.'" Id. at 993 (quoting United States v. Layeni, 90 F.3d 514, 520 (D.C. Cir. 1996)); see also id. at 995.[16]

The government cites to other cases, but none presented the fact pattern at issue here. See, e.g., Hollingsworth, 27 F.3d at 1200-02, 1204-05; United States v. Hodges, 936 F.2d 371, 371-72 (8th Cir. 1991); United States v. Pilarinos, 864 F.2d 253, 254-56

---

[16] The government reads Washington differently, concluding that Washington requires the actual inducement applied to the intermediary to be the same kind of inducement applied to the defendant. This reading seems premised on an assumption that the FBI agent in Washington had improperly induced the middleman. Yet the court merely described the agent as "asking" for the middleman's assistance. Washington, 106 F.3d at 991. Washington contains no explanation of how this inducement was improper, and the court's logic suggests that any inquiry into the propriety of the agent's request would be irrelevant. Moreover, Washington cited an earlier D.C. Circuit case -- Layeni -- for its rule. See id. at 993-95. Layeni had in turn implied that the derivative entrapment defense is available if a government agent merely "suggests" to an intermediary that he apply particular inducements to a defendant. See Layeni, 90 F.3d at 518.

(2d Cir. 1988).[17]  The Seventh Circuit has even intimated that the defense might be available when a government agent specifically targets the defendant, and then encourages the middleman to induce that defendant.  See Hollingsworth, 27 F.3d at 1204 (citing, inter alia, Bradley).

Thus we conclude that the district court erred in answering the jury's question in a way that excluded Merlino's order from the jury's consideration.  We do not suggest that a jury would necessarily have concluded that Luisi was entrapped through Merlino.  We hold only that the defendant was entitled to have a properly instructed jury consider the issue.

C.        Predisposition

As a fallback argument, the government contends that Luisi failed to present sufficient evidence of his lack of predisposition, and thus was not entitled to any entrapment instruction at all.  We readily dispose of this argument.

A judge may only instruct the jury on entrapment if the defendant meets his entry-level burden of production.  United

---

[17] The Sixth and Eleventh Circuits have, in somewhat limited fashion, also rejected unwitting intermediary claims on the facts presented.  See, e.g., United States v. McLernon, 746 F.2d 1098, 1109 (6th Cir. 1984); United States v. Mers, 701 F.2d 1321, 1340 (11th Cir. 1983).  With one exception, we are not aware of any cases in which these circuits have faced facts similar to those in this case.  The one exception would be the Fifth Circuit's 1980 decision in Anderton -- which is binding precedent in the Eleventh Circuit, see Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) -- and Anderton supports our reasoning in this case.

States v. Gifford, 17 F.3d 462, 467 (1st Cir. 1994). That is, a defendant is entitled to an entrapment instruction only if there is "some evidence," on both elements of the entrapment defense, sufficient to raise a reasonable doubt that the defendant was merely an unwary innocent. See United States v. Joost, 92 F.3d 7, 12 (1st Cir. 1996). The defendant must show "more than a scintilla of evidence, more than mere creation of an opportunity for criminal activity." Id. Nonetheless, even a defendant's self-serving testimony can suffice, especially when it has some circumstantial corroboration. See id.

Luisi made the requisite entry-level showing. We have already explained why a jury could find improper governmental inducement. Additionally, Luisi introduced "some evidence" of his lack of predisposition. He testified that sometime before he met McGowan, he experienced a "spiritual encounter," and that as a result of this spiritual encounter he resolved to stop dealing drugs. This story was consistent with evidence that Luisi had deliberately stalled the drug transaction for several months to "pal off" McGowan, thereby indefinitely delaying a drug deal to which Luisi was opposed. Indeed, a jury could find that this two-month delay stood in stark contrast to the two-day lag between when Merlino gave Luisi the order, and when McGowan received drugs from Luisi's colleagues.

The government suggests that Luisi's "spiritual encounter" was not credible, and that there was "overwhelming" evidence of Luisi's predisposition, including the fact that he previously had been a cocaine dealer, and the fact that Luisi continued to receive profits from small drug deals undertaken by one of his associates.

In this procedural posture, however, our job is not "to weigh the evidence, make credibility determinations, or resolve conflicts in the proof." Gamache, 156 F.3d at 9. Accordingly, we find that Luisi introduced sufficient evidence of his lack of predisposition to entitle him to an entrapment instruction.

## III.

Luisi further argues that the charges against him in fact should have been dismissed because the government engaged in outrageous conduct that violated his due process rights. Outrageous government conduct is an issue of law, and it is the province of the district court -- and not the jury -- to rule on a defendant's motion to dismiss on that ground. See Bradley, 820 F.2d at 7 n.5. When a district court rules on such a motion, its ultimate conclusion is subject to de novo review, while its factual findings are reviewed for clear error. See United States v. Guzman, 282 F.3d 56, 58 (1st Cir. 2002).

In this case, the district court never ruled on Luisi's motion, and thus we have no factual findings in the record to

assist us.[18] Nonetheless, we think that the basic facts needed to rule on this matter are clear enough, and that we are able to reach the necessary legal conclusions. Luisi has asked us to find that the government's conduct was outrageous, and the government has also asked us to resolve the issue.

The outrageousness doctrine permits dismissal of criminal charges only in those very rare instances when the government's misconduct is so appalling and egregious as to violate due process by "shocking . . . the universal sense of justice." Russell, 411 U.S. at 432 (quoting Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246 (1960))(internal quotation marks omitted); see also United States v. Nunez, 146 F.3d 36, 38 (1st Cir. 1998). While the doctrine is often invoked by criminal defendants, it has never yet been successful in this circuit. See United States v. Santana, 6 F.3d 1, 4 (1st Cir. 1993) (collecting First Circuit cases rejecting the argument); United States v. Panitz, 907 F.2d 1267, 1272-73 (1st Cir. 1990) (collecting additional First Circuit cases rejecting the argument); see also, e.g., United States v. Capelton, 350 F.3d 231, 243 n.5 (1st Cir. 2003) (rejecting the argument on the facts presented); Nunez, 146 F.3d at 38-39 (same);

---

[18] It is not clear to us whether the district court implicitly denied the motion or not, but in any event we are left with no findings of fact and no reasoning.

<u>United States</u> v. <u>Matiz</u>, 14 F.3d 79, 82-83 (1st Cir. 1994) (same). This case is no exception.[19]

Luisi's argument for dismissal of the charges relies heavily on dicta in <u>Bradley</u> that "outrageous conduct . . . might well be found in a threat of serious physical harm." 820 F.2d at 7. But at the same time, <u>Bradley</u> acknowledged that an outrageousness claim might be defeated if a defendant has been "too active himself." <u>Id.</u> Moreover, defendant Bradley himself had not been threatened, and we declined to consider the matter further. <u>See</u> <u>id.</u>

Whatever fact situation <u>Bradley</u> had in mind, it was not this one. Here, even though the government's actions have risked giving the defendant a viable entrapment claim, it is another thing entirely to say that the conduct was "outrageous." After considering the totality of the circumstances in this case, we think the government's actions fell well short of shocking the "universal sense of justice."

---

[19] In <u>United States</u> v. <u>Twigg</u>, 588 F.2d 373 (3d Cir. 1978), the Third Circuit did find outrageous misconduct. As our court has recognized, however, the Third Circuit has subsequently questioned its own holding in <u>Twigg</u>. <u>See</u> <u>United States</u> v. <u>Porter</u>, 764 F.2d 1, 9 n.4 (1st Cir. 1985) (citing <u>Beverly</u>, 723 F.2d at 12). In any event, the factual background of <u>Twigg</u> makes it readily distinguishable.

-36-

IV.

The judgments of conviction are <u>vacated</u> and the case is <u>remanded</u> for further proceedings consistent with this opinion.[20]

---

[20] In light of our disposition, we have no need to address Luisi's claim that he was sentenced improperly in light of <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005).